UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

WILFREDO TORRES,

                    Plaintiff,

- against -

MS. ANDERSON, et al.,

                    Defendants.
------------------------------------------------------------ X

**MEMORANDUM DECISION AND ORDER**

08 Civ. 5205 (BMC)

**COGAN**, District Judge.

Plaintiff *pro se*, a prisoner in federal custody, brings this action as a result of the prison's revocation of his assignment to a bottom bunk. Plaintiff alleges that prison authorities knew that he was prone to violent seizures, and when they assigned to him to a top bunk, he fell and injured himself. Plaintiff asserts claims under the "Fifth and Eighth Amendments to the United States Constitution," pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999 (1971), which the Court construes to be against the individual employees of the Federal Bureau of Prisons ("BOP"), and under the Federal Tort Claims Act, 28 U.S.C. §1346(a) ("FTCA"), which the Court construes to be against the United States. The case is presently before me on defendants' motion to dismiss or for summary judgment as to the Bivens claim for failure to exhaust administrative remedies under the Prison Litigation Reform Act, 42 U.S.C. §1997e(a) ("PLRA"). For the reasons set forth below, the Court grants the motion for summary judgment and the individual defendants are dismissed.[1]

---

[1] The Court provided plaintiff with notice as to the requirements and consequences of summary judgment motions under Local Rule 12.1. Docket [46] attachment [1].

## BACKGROUND

Plaintiff arrived at the Metropolitan Detention Center ("MDC"), a BOP facility, on December 6, 2007, as an interim stop while being transported to his ultimate destination at the Federal Correctional Center in Elkton, Ohio ("FCI Elkton"). He remained at the MDC until January 29, 2008. Although originally assigned to a bottom bunk at the MDC, plaintiff's bottom bunk pass was revoked on December 13, 2007. He avers that he fell out of the top bunk on December 14, 2007, and injured himself.

His affidavit further states that on December 20, 2007, after speaking to his counselor and being advised that the MDC was out of the forms used to seek informal resolution of grievances, known as a BP-8 form, he obtained assistance from another inmate and wrote his own BP-8. He does not expressly say that he submitted it on that date, and he has not provided a copy, but he implies that he submitted it on that date, and giving him the benefit of the doubt as a *pro se* litigant, I will assume that he did.

Hearing nothing in response to his submission, plaintiff created and filed another BP-8 form on January 28, 2009, a copy of which he has filed in this case. Again hearing nothing in response to that submission, he filed a formal grievance, known as a BP-9, on February 26, 2009. However, by that time, he had been transferred to FCI Elkton. Instead of filing the BP-9 with staff at FCI Elkton, he mailed it back to the MDC. The BOP has no record of receiving plaintiff's first alleged BP-8, his second BP-8, or his BP-9.

Again hearing nothing, plaintiff filed an appeal from the failure to act on his BP-9, using a form called a BP-10, which is an appeal to the regional authority, on May 20, 2008. This is the first of his forms that the BOP has a record of receiving. The grievance was denied on the ground that plaintiff had failed to seek informal resolution or filed a BP-9 at the institutional

2

level. On July 11, 2008, he filed a BP-11, which is an appeal to the BOP's General Counsel. It was rejected for the same reason as his BP-10.

Plaintiff thereupon commenced this action.

## DISCUSSION

### I. Exhaustion under the PLRA

Plaintiff acknowledges that he is required to have exhausted his administrative remedies prior to commencing this action. The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); see Woodford v. Ngo, 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006). This provision affords "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and also creates an administrative record that facilitates judicial review. Jones v. Bock, 549 U.S. 199, 204, 127 S.Ct. 910, 914-15 (2007) (citations omitted); see Woodford, 548 U.S. at 91 n.2, 126 S.Ct. at 2386 n.2; see also Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004). The exhaustion requirement covers all claims that an inmate might bring, whether a single incident of an alleged violation of constitutional rights or the complaints about daily prison conditions that prisoners often raise. Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002) (citation omitted). It follows that failure to exhaust prior to the commencement of a lawsuit requires dismissal of the prisoner's claim. See id., 534 U.S. at 524-25, 122 S.Ct. at 988.

The Supreme Court's decision in Woodford makes it clear that mere attempts to exhaust are insufficient. See id., 548 U.S. at 93-94, 126 S.Ct. at 2387. Rather, "proper exhaustion"

3

requires a plaintiff to "compl[y] with the system's critical procedural rules." Id., 548 U.S. at 95, 126 S.Ct. at 2388; see also Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007) (citing Woodford). Woodford, like the instant case, involved the administrative rejection of a prisoner's claim because he failed to comply with the prison system's rules requiring the filing of such a claim within 15 days of the incident giving rise to it.

Prior to Woodford, the Second Circuit had set forth a three-part test to determine if the requirement of exhaustion had been met. Under Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004), a court should first consider "whether the administrative remedies were in fact 'available' to the prisoner." Second, a court must determine whether "the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." Id. Third, a court should examine whether there were "special circumstances" that excused plaintiff's failure to adhere to the administrative procedural requirements. Id. Although several courts have questioned whether Hemphill's framework survives Woodford, district courts within the Circuit continue to apply it. See, e.g., Winston v. Woodward, 05 Civ. 3385, 2008 WL 2263191, *6 (S.D.N.Y. May 30, 2008) (collecting cases); see also Macias, 495 F.3d at 43 n.1 (declining to determine what effect Woodard has on Hemphill).

## II. The BOP's Administrative Remedy Program

The BOP maintains a four step grievance process known as the Administrative Remedy Program ("ARP"), which is codified at 28 C.F.R. §542.10 *et seq.*[2] and further explained in Program Statement P1330.16, copies of which are maintained in the law libraries of BOP's

---

[2] In Macias, the Second Circuit referred to ARP as a three-step process, combining the third and fourth step described below. 495 F.3d at 42.

4

facilities. The Program Statement essentially constitutes an annotation and commentary on the regulations.

Step one requires submission of the grievance to a staff member, and the institution will attempt to resolve it on an informal basis. 28 C.F.R. §542.13. The regulation itself does not require a written submission, although specific procedures for informal resolution are promulgated by the Warden at each facility.

Step two requires the formal submission of the grievance on a BP-9 form. The regulation requires that this submission must be within 20 days of the incident giving rise to the grievance. Id. §542.14(a). The Warden of the facility may allow an extension for a "valid reason," which is generally defined as "a situation which prevented the inmate from submitting the request" within the 20 day period. Id. §542.14(b).

The BP-9 must be submitted to a designated staff member, usually a correctional counselor. Id. at §542.14(c)(4). The Program Statement explains where the BP-9 should be submitted when an inmate has been transferred away from the institution where the incident occurred: "A [BP-9] Request should be submitted and logged in at the institution where the inmate is housed at the time the inmate gives the Request to the counselor or other appropriate staff member." Program Statement ¶13(a). The Warden of the institution has 20 days to respond to the BP-9; if no response is received for 40 days, the inmate "may consider the absence of a response to be a denial . . . ." 28 C.F.R. §542.18.

If the inmate is not satisfied with the disposition of BP-9, he can proceed to step three, an appeal to the Regional Director of the BOP using form BP-10. Id. §542.15. The time periods operate similarly to the BP-9; the BP-10 must be filed within 20 days of the disposition of the BP-9, subject to being extended for a "valid reason." Id. §542.15(a).

The final step, if satisfaction has still not been obtained, is to appeal to the BOP's General Counsel's Office using a form BP-11. This second appeal must be filed within 30 days of the disposition of the BP-10. Id.

**III. Application**

Defendants raise three arguments to show that plaintiff has failed to exhaust his claim.

First, they assert that there is no proof that plaintiff attempted an informal resolution. However, viewing the facts in the light most favorable to plaintiff, his affidavit implies that he advised his counselor of the problem on December 20, 2007, either orally or by creating his own BP-8 form. This constitutes a sufficient attempt at informal resolution.

Second, defendants contend that plaintiff failed to comply with the requirement in the Program Statement that he submit his BP-9 to the institution in which he was then housed at the time of submission, rather than the institution where the incident giving rise to the grievance occurred. Because plaintiff mailed it to the MDC when he was no longer resident there, defendants assert, staff members at the MDC could not log it in, and it would have been MDC policy to promptly return the mailing to the sender. Indeed, defendants contend that the BOP's database, known as SENTRY, only accepts filings for inmates at the institution where the inmate is housed. Defendants thus state in an affidavit that "because plaintiff had long since departed MDC at the time plaintiff mailed the BP-9, MDC staff would have been unable to log in receipt of the BP-9 on SENTRY (and concomitantly, to accept or reject it)."

Viewed under Woodford, the issue raised by this argument is whether the procedure requiring submission to the facility in which the inmate is housed, rather than where the incident occurred, is a "critical procedural rule" under the ARP. Assuming the continued viability of

6

Hemphill and its progeny, the issue under that framework is whether there are "special circumstances" that excuse plaintiff's failure to comply. Under either test, however, defendants' position cannot be sustained.

The language providing for filing in the inmate's current facility appears in neither the regulations nor in the internal procedures of either of the facilities in which plaintiff was housed. It is only set forth in the Program Statement. Although defendants assert that the Program Statement is contained in the law libraries of BOP facilities and is otherwise "publicly available," there is no indication why an inmate would look for what appears on its face to be an internal BOP memorandum. (Indeed, the cover note under which defendants have filed the Program Statement in this Court makes it clear that the Program Statement was intended in part for the use of prison staff.) The problem is compounded by the fact that the subject language is located on page 11 of the 14 page memorandum, under a heading entitled "REMEDY PROCESSING" and a subheading entitled "Receipt," and the primary focus of the section is what staff should do when a BP-9 is received; the section only mentions at the end where an inmate should file if he has been transferred.

More importantly, the Program Statement does not expressly impose an affirmative obligation on inmates to file their BP-9 in the facility in which they are housed, as opposed to the facility in which the incident occurred. Rather, it says inmates "should" file in their current facility. This could readily be interpreted as a permissible alternative for the convenience of the inmate rather than a requirement of the ARP. Such an interpretation is furthered not only by the absence of mandatory language, but also the absence of any identified consequences if the inmate chooses to file where the incident occurred, even though he is no longer housed there.

Obviously, the Program Statement gives no indication of the point stressed by defendants here – that staff members at the prior facility are unable to log in to the SENTRY system and enter the BP-9 once the inmate has left that facility. But even that rationale seems questionable. The same paragraph of the Program Statement states that "[i]f an inmate is transferred after giving the [BP-9] Request to a staff member, but before that Request is logged in or answered, the institution where the Request was first given to a staff member remains responsible for logging and responding to that Request." So it appears, contrary to defendants' submissions, that staff members at the "originating" institution retain the ability to log in and respond to the BP-9, notwithstanding the inmate's departure for another facility. At the very least, an inmate could well be confused as to whether he is required or permitted to submit his BP-9 to the originating institution.

This place-of-filing directive is not what the Supreme Court referred to as a "critical procedural rule" in Woodford. If the procedure was critical, it would be explained more clearly, placed in a more prominent location, use mandatory language, and make clear the consequences of non-compliance. Additionally, under Hemphill and its progeny, the failure to communicate with sufficient clarity that which defendants contend is a mandatory procedure is a "special circumstance" that would excuse compliance. See Giano v. Goord, 380 F.3d 670, 676-77 (2d Cir. 2004) (finding that reasonable misinterpretation of applicable regulations constitutes "special circumstance" excusing compliance).

However, defendants prevail on their final point. Putting aside the fact that plaintiff's BP-9 was apparently never received, it would not have been timely even if it had been received. Despite repeated opportunities that the Court offered to plaintiff, he has not articulated any reason why he did not file his BP-9 until more than two months after the incident instead of the

20 days that was required. Unlike the place-of-filing directive for transferred inmates, the 20 day requirement is set forth clearly in the regulations. See 28 C.F.R. §542.14(a). And although the regulations permitted the Warden at the institution to extend the 20 day period, plaintiff neither sought an extension nor offered any reason why he did not file within it. With no reason for the late filing having been put forward to either the BOP or this Court, plaintiff failed to exhaust his claim administratively.

Plaintiff's submission of his BP-10 had the same infirmity. Indeed, it shows he was aware that his BP-9 was "deemed denied" because no action had been taken on it for 40 days – since his BP-10 expressly says that – but instead of filing his BP-10 within 20 days thereafter, he inexplicably waited more than three months longer than that to file it.

Woodford leaves no doubt that filing dates are "critical procedural rules" under prison administrative resolution programs, as that case itself involved a missed filing date. The Court found filing deadlines particularly important because, if not enforced, it would be simple for inmates to avoid the administrative resolution process entirely. "For example, a prisoner wishing to bypass available administrative remedies could simply file a late grievance without providing any reason for failing to file on time. If the prison then rejects the grievance as untimely, the prisoner could proceed directly to federal court." Woodford, 548 U.S. at 95, 126 S.Ct. at 2388. Plaintiff may contend, although he has not expressly stated, that his failure to meet the deadlines was not deliberate, but a deliberate failure to timely act and an unexplained failure to timely act are functionally and legally equivalent. Id. Like the hypothetical prisoner in Woodford's example, plaintiff filed his late submissions "without providing any reason for failing to file on time," id., and he has not offered any reason here.

The record thus discloses that remedies were available to plaintiff; that defendants took no action to prevent him from timely invoking them; and that there are no special circumstances that excuse his non-compliance. See Hemphill, 380 F.3d at 686. Although denial of plaintiff's claim for non-exhaustion may seem severe considering his status as a prisoner and *pro se* litigant, the Supreme Court considered that in Woodford and held that such considerations "overlook[] the informality and relative simplicity of prison grievance systems . . . as well as the fact that prisoners who litigate in federal court generally proceed *pro se* and are forced to comply with numerous unforgiving deadlines and other procedural requirements." 548 U.S. at 103, 126 S.Ct. at 2393.

## CONCLUSION

Defendants' motion for summary judgment is granted, and the complaint is dismissed as to the individual defendants. The case is returned to Magistrate Judge Bloom to complete pretrial proceedings as to the FTCA claim.

**SO ORDERED.**

/Signed by Judge Brian M. Cogan/

U.S.D.J.

Dated: Brooklyn, New York
December 16, 2009